IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QUEEN CARNEY, individually and as Administrator of Estate of Edward Pickens     and MALIK SEAN PICKENS and JAMAR EDWARD PICKENS, by their legal guardian, CHALETTE ROLAND, and CHALETTE ROLAND, individually and in her own right     and EMMANUEL SIDNEY by his legal guardian, SARAH SIDNEY, and SARAH SIDNEY, individually and in her own right, | : : : : : : : : : : : : : : : | CIVIL ACTION  NO. 05-5321 |
| Plaintiffs, | : : | |
| v. | : : | |
| CITY OF PHILADELPHIA PHILADELPHIA POLICE DEPARTMENT OFFICER JOHN RAMIREZ, Defendants. | : : : : | |

## MEMORANDUM

BUCKWALTER, S. J.                                                                                                           August 8, 2007

      Presently before the Court is Defendants', City of Philadelphia ("City") and Officer John Ramirez, Motion for Summary Judgment (Docket No. 15) and Plaintiffs' Response (Docket No. 17) thereto. For the reasons set forth below, Defendants' Motion for Summary Judgment will be granted.

I.      BACKGROUND AND PROCEDURAL HISTORY

On Sunday, August, 3, 2003, the Narcotics Strike Force ("NSF") of the Philadelphia Police Department was conducting surveillance outside of 1147 South Ruby Street for suspected illicit narcotics sales. (Defendants' Ex. E at 5)[1].

At approximately 10:05 p.m., Officer Daniel Brooks observed the Decedent, Edward Pickens ("Decedent"), entering and then leaving the Ruby Street location. (Defendants' Ex. E at 5). Officer Brooks suspected the Decedent of making an illegal narcotics transaction and radioed a description of the Decedent to Officers John Ramirez and Jose Candelaria. Id. Officers Ramirez and Candelaria were in police uniform and in a marked police vehicle when they received the radio description of the Decedent. (ORD at 71 ln. 8 and at 61 ln. 16; OWD at 28 ln. 6-8). After the Decedent exited the Ruby Street location, Officer Brooks' partner, Officer Mark Wolf, began to follow the Decedent in his unmarked police vehicle. (OWD at 33 ln. 9-10).

Upon receiving the radio description, Officers Ramirez and Candelaria soon observed the Decedent a few blocks from Ruby Street. (OCD at 36 ln. 17-21). Officer Wolf drove by Officers Ramirez and Candelaria and radioed them that the individual coming towards them was the person suspected of the illegal narcotics transaction. (ORD at 61 ln. 16-19).

In an effort to give an accurate accounting of the events leading up to the Decedent's death, the facts below have been separated to give each witnesses' recollection of the events that transpired that night.

---

1. The following abbreviations will be used to cite to the various Exhibits submitted to the court:
    Officer Ramirez's Deposition - ORD.
    Officer Wolf's Deposition - OWD.
    Officer Candelaria's Deposition - OCD.
    Leroy Willis' Deposition - LWD.

2

### A. Officer Ramirez's Account

After receiving radio confirmation from Officer Wolf, Officer Ramirez, who was driving, stopped and exited the vehicle with Officer Candelaria. (ORD at 62 ln. 12-14). Officer Candelaria was the first to approach the Decedent. (ORD at 62 ln. 22). Officer Ramirez heard Officer Candelaria say to the decedent "Yo, my man, come here." (ORD at 62 ln. 16-17). Officer Candelaria put his hand on the Decedent's shoulder and the Decedent turned towards Officer Candelaria with his gun pointed and fired. (ORD at 62-63 ln. 22, 3-5). Officer Candelaria fell. (ORD at 63 ln. 5-6).

After Officer Candelaria fell the Decedent began to run. (ORD at 63 ln. 6-7) Officer Ramirez began to run after the Decedent drawing his gun and telling the Decedent "police, drop the gun, drop the gun, drop the fucking gun." (ORD at 63 ln. 7-9). While running, the Decedent had is hand extended holding his weapon and attempting to fire at Officer Ramirez. (ORD at 63 ln. 9-11, 22-23). Officer Ramirez fired at the Decedent but missed because the Decedent had ducked. (ORD at 64 ln. 8). Upon ducking, the Decedent came up quickly with his gun pointed at Officer Ramirez, at which time Officer Ramirez fired a second shot at the Decedent. (ORD at 64 ln. 8-12). The Decedent fell to the ground, and Officer Ramirez told him to drop his gun. (ORD at 92-93 ln. 19, 3). Officer Ramirez did not realize at first that he had hit the Decedent and Officer Candelaria kicked the Decedent's gun away from him. (ORD at 93 ln. 5-15). Next, Officers Candelaria and Ramirez exchanged comments and determined that they were both not injured. (ORD at 93 ln. 18-21). After this exchange, Officer Ramirez went over to the radio and communicated that shots had been fired and that a supervisor and rescue were needed. (ORD at 93-94 ln. 24, 1-2).

3

### B. Officer Candelaria's Account

After Officers Ramirez and Candelaria received the radio communication, Officer Candelaria approached the Decedent and asked Officer Ramirez, about an unrelated address in an effort to throw off the Decedent's suspicion that the Officers were interested in him. (OCD at 40 ln. 14-15). Officer Candelaria said to Officer Ramirez "what's that address again." (OCD at 40 ln. 15-16). Then Officer Candelaria grabbed the Decedent from either the side or behind, and the Decedent turned and put his gun on Officer Candelaria. (OCD at 40 ln. 21-24). The Decedent told Officer Candelaria to get off of him and then fired his weapon, at which point Officer Candelaria tripped on nearby steps and fell. (OCD at 40-41 ln. 24-1; 44 ln. 3-7). Officer Candelaria pulled his gun and saw the Decedent running and pointing his gun at Officer Ramirez as Officer Ramirez ran after the Decedent. (OCD at 46-47 ln. 19, 3-6). Officer Candelaria cannot recall whether or not Officer Ramirez said anything to the Decedent while Officer Ramirez and the Decedent were running. (OCD at 51 ln. 12-18). As Officer Ramirez was running he fired at the Decedent, the Decedent ducked and came up with his gun pointed again at Officer Ramirez and Officer Ramirez fired a second shot. (OCD at 47 ln. 5-10). The Decedent fell after the second shot and Officer Candelaria approached the Decedent and ordered the Decedent to drop his gun. (OCD at 62 ln. 3-6). The Decedent complied. (OCD at 62 ln. 15-16). Officer Ramirez was very upset and he said "shots were fired , they got Danny, shot Danny." (OCD at 63 ln. 10-13).[2] Officer Wolf was the first person on the scene after the incident, and

---

2. Initially, Officer Ramirez thought Officer Candelaria had been wounded as evidenced by Officer Ramirez's statement that Danny had been shot. Officer Candelaria's middle name is Danny. (OCD at 63 ln. 15-18).

shortly thereafter Sergeant McCloskey arrived and checked Officer Ramirez's weapon. (OCD at 64-65 ln. 19-22, 19-24).

### C. Officer Wolf's Account

After the Decedent left the Ruby Street location Officer Wolf began following the Decedent. (OWD at 36 ln. 19-20). Officer Wolf radioed a description of the Decedent and the Decedent's location and Officers Ramirez and Candelaria were the first to arrive at the location. (OWD at 39 ln. 1-3). Officer Wolf observed Officers Ramirez and Candelaria exit their vehicle. (OWD at 42 ln. 1). As Officer Wolf passed the Decedent, he saw the Decedent with his right hand down in his waistband area. (OWD at 42 ln. 11-13). Next, Officer Wolf heard a shot. (OWD at 42 ln. 13). Officer Wolf did not see the first shot of the evening. (OWD at 49 ln. 12-19). Officer Wolf made a u-turn and saw the Decedent with his gun drawn and Officers Ramirez and Candelaria approaching the Decedent. (OWD at 53 ln. 16-22). Officer Wolf then saw Officer Ramirez fire two shots and the Decedent fall. (OWD at 42 ln. 21-22). Officer Wolf then pulled up to the Decedent and saw Officer Candelaria remove a black handgun from the Decedent's right hand. (OWD at 61 ln. 5-7). Officer Wolf remembers a supervisor being called to the scene and some other notifications being made. (OWD at 61 ln. 12-13).

### D. Independent Witness' Account

Mr. Leroy Willis was drawn to his bedroom window when he heard a vehicle pull up and skid and a person say "hold it right there."(LWD at 18 ln. 5-8).[3] Prior to reaching the window, Mr. Willis heard three gunshots fired. (LWD at 27 ln. 20-21). The cadence of the shots

---

3. Mr. Willis had just received a phone call from his step daughter saying she was on her way home from work and was about two blocks away and could Mr. Willis open the front door for her because she had forgotten her key at home. (LWD at 17 ln. 20-24).

5

fired was 'pow' slight pause and then 'pow' 'pow,' i.e. the second two shots were closer together.  (LWD at 30 ln. 5-12).  At this point, Mr. Willis looked out the window and saw a man behind a jeep door holding a gun.  (LWD at 24 ln. 20-25).  The man was not in police uniform and his car was not a marked police vehicle.  (LWD at 42-43 ln. 24-25, 2-4).  Next, Mr. Willis observed that same man bang on the hood of the jeep saying "mother fucker, mother fucker, mother fucker, mother fucker" approximately four times.  (LWD at 26 ln. 6-9).  Mr. Willis then ran down the stairs of his home to the front door.  (LWD at 27 ln. 23-24).[4]  Once Mr. Willis reached his front door he saw a female police officer running down the street towards his home and the gentleman holding the gun by the jeep.  (LWD at 31-32 ln. 9-21, 8-10).  Upon reaching the front door, Mr. Willis observed the Decedent laying on the pavement.  (LWD at 39 ln. 10-12).  Mr. Willis did not initially see a gun laying near the Decedent's person, but later he did see the gun laying next to the Decedent.  (LWD at 47 ln. 5-16).

### E. Forensic Examination Evidence

A forensic firearms examination revealed that the 9MM handgun recovered from the Decedent at the scene had been fired one time.  (Defendants' Ex. E at 6).  The spent 9MM cartridge casing did not clear the breech, jamming the weapon, and preventing the Decedent from discharging a second round.  (Defendants' Ex. E at 6).  Further, forensic examination revealed the presence of gunpowder particles on the front of Officer Candelaria's police uniform shirt.  (Defendants' Ex. E at 6).

### F. Procedural History

---

4. Mr. Willis told his wife to call 9-1-1, but he is not sure if she did because they saw a uniformed female police officer on the scene when they opened their front door and thus assumed help had already been called.  (LWD at 31 ln. 7-14).

On or about September 19, 2005, this action was filed in the Court of Common Pleas for Philadelphia County. On October 11, 2005, this case was removed to the United States District Court for the Eastern District of Pennsylvania. On January 1, 2007, the Defendants filed a motion for summary judgment claiming that Officer Ramirez is entitled to qualified immunity and that insufficient evidence had been alleged to support a finding of municipal liability against the City. The Plaintiffs filed their response motion stating that summary judgment should be denied because there are genuine issues of material fact.

## II.      STANDARD OF REVIEW

A motion for summary judgment will be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the nonmoving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 ©. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Since a grant of summary judgment will deny a party its chance in court, all inferences must be drawn in the light most favorable to the party opposing the motion. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The ultimate question in determining whether a motion for summary judgment should be granted is "whether reasonable minds may differ as to the verdict." Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 129 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

**III.   DISCUSSION**

In accordance with the standard for granting summary judgment, the Court will draw the following inferences in the light most favorable to the Plaintiffs: Officers Ramirez and Candelaria were not in police uniform; Officers Ramirez and Candelaria were in an unmarked police vehicle; and Officers Ramirez and Candelaria failed to identify themselves as police officers.

**A.  Qualified Immunity**

Qualified immunity is "immunity from suit rather than a mere defense to liability," and therefore, claims of immunity should be resolved at the earliest possible stage in the litigation. Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Mitchell v. Forsyth, 472 U.S. 511,, 526 (1985)). Resolving qualified immunity is a two step process. Saucier v. Katz, 533 U.S. 194, 200 (2001). Initially, the Court must determine whether "the facts alleged, [when] viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right." Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002) (citing Saucier, 533 U.S. at 201). If no constitutional right has been violated then there is no need for further inquiry. Saucier, 533 U.S. at 201. However, if the facts alleged do demonstrate that a constitutional right has been violated, then the Court must determine whether the right asserted was "clearly established" at the time of the officer's unlawful conduct. Id. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. This second inquiry "must be undertaken in light of the case's specific context, not as a broad general proposition." Id. at 201.

In the instant case, the Plaintiffs filed suit against Officer Ramirez under 42 U.S.C. § 1983, alleging violations of the Decedent's constitutional rights. In response, Defendants filed a motion for summary judgment based on an assertion of qualified immunity for Officer Ramirez's use of deadly force. Officer Ramirez does not contest that he violated the Decedent's constitutional rights. Rather, Officer Ramirez asserts that he is entitled to qualified immunity because he acted as a reasonable Officer under the circumstances he confronted.

Even assuming the Decedent's constitutional rights were violated and viewing the facts in a light most favorable to the Plaintiffs, the evidence shows that Officer Ramirez saw Officer Candelaria get shot at and the Decedent, still holding and aiming his gun, begin to run down the street. It is important to note that the independent witness, Leroy Willis, did not see any of the shots fired. Rather, Mr. Willis heard three shots fired and the cadence of the shots, is consistent with the Officers' account of the events. Both Officers Ramirez and Candelaria stated that the Decedent fired first at Officer Candelaria and then, Officer Ramirez, in an effort to apprehend the Decedent, fired one shot which missed and quickly fired a second shot which hit the Decedent. Additionally, Officer Wolf's observations of the Decedent's hand in his waistband, hearing the initial shot fired, and seeing Officer Ramirez fire two shots quickly, are consistent with all the accounts.

Furthermore, the forensic firearm examination is objective evidence which supports Officer Ramirez's account of the events. The gun removed from the Decedent at the scene was analyzed and was determined to have jammed, making it impossible for the Decedent to have fired his weapon a second time. In addition, the gunpowder residue found on Officer

9

Candelaria's shirt is consistent with the Officers' accounts that the Decedent fired at Officer Candelaria.

This Court finds it reasonable for an assisting officer, who has witnessed his partner being shot at and the person, the Decedent, who shot at his partner begin to run down the street still holding the gun and attempting to fire it again, to pursue and use deadly force if necessary to apprehend the suspect. <u>Tennessee v. Garner</u>, 471 U.S. 1, 11 (1985) (quoting "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."). Therefore, even when viewed in the light most favorable to Plaintiffs, it was objectively reasonable under the particular circumstances of this case for Officer Ramirez to believe his assistance, including the use of deadly force, was lawful. Accordingly, this Court holds that Officer Ramirez is entitled to qualified immunity.

### B. Municipal Liability

For a municipality to be held liable for damages under § 1983, a plaintiff must demonstrate that the municipality itself has a policy or custom that resulted in a violation of the plaintiff's constitutional rights; a municipality cannot be held liable under a theory of respondeat superior or vicarious liability. <u>Monell .v Dep't of Soc. Servs. of N.Y.</u>, 436 U.S. 658, 690-691 (1978). "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (citing <u>Prembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986)). A custom can be established by showing a course of conduct that is "permanent and well settled." <u>Monell</u>, 436 U.S. at 691. Additionally, when a

plaintiff alleges municipal liability under § 1983 based on a custom of failing to train the police properly a plaintiff must demonstrate that the city was "deliberately indifferent" to the rights of persons with whom the police come into contact. City of Canton v. Harris, 489 U.S. 378, 389 (1989). Once established, the plaintiff is required to show that the municipality's custom caused his injury. Berg v. Allegheny County, 219 F.3d 261, 276 (3d Cir. 2000) (citing Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997)).

> In asserting that the City is liable for the Decedent's death, Plaintiffs state that
>
>> all activities by any alleged defendant were carried out in furtherance of and in the scope of alleged authority under color of law and the defendants, City of Philadelphia and Philadelphia Police Department, did do and perform or fail to perform the following acts: a. failing to reprimand and/or discharge or otherwise discipline police officers found to have engaged in violent and unlawful conduct; b. failing to warn police officers to avoid violent and unlawful conduct or to instruct them on techniques devised to do so; c. deliberate indifference to constitutionally offensive acts carried out within the Philadelphia Police Department; d. authorizing either intentionally or tacitly, constitutionally offensive acts; e. fostering violent and unlawful conduct of police officers by providing legal counsel to officers alleged to have committed violent and unlawful acts, and paying monies in satisfaction of judgments rendered against Philadelphia Police Officers; and f. failing to enforce existing standards relating to procedures for investigation, custody, detention and arrest.

Plaintiff's Complaint ¶18. The above allegations are unsupported by evidence in the record. Quiroga v. Hasboro, Inc., 934 F.2d 497, 500 (3d Cir. 1991) (stating "Quiroga must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or such vague statements ...."). As the Plaintiffs have put forth no other evidence, than the circumstances of this case, that a custom or policy is maintained by the City that violates a

person's constitutional rights, there is insufficient evidence to establish municipal liability. Henderson v. City of Philadelphia, No. 98-3861, 1999 WL 482305, at *22 (E.D. Pa. July 12, 1999) (stating "Plaintiffs' expert's conclusory opinion that the city was deliberately indifferent to the need for further training is insufficient to prevent summary judgment, as the court is not obliged to accept conclusory legal allegations from either the plaintiffs or their experts." (citation omitted)).

### IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QUEEN CARNEY, individually and as Administrator of Estate of Edward Pickens and MALIK SEAN PICKENS and JAMAR EDWARD PICKENS, by their legal guardian, CHALETTE ROLAND, and CHALETTE ROLAND, individually and in her own right and EMMANUEL SIDNEY by his legal guardian, SARAH SIDNEY, and SARAH SIDNEY, individually and in her own right, | : : : : : : : : : : : : : | CIVIL ACTION NO. 05-5321 |
| Plaintiffs, | : : | |
| v. | : : | |
| CITY OF PHILADELPHIA, PHILADELPHIA POLICE DEPARTMENT and OFFICER JOHN RAMIREZ, Defendants. | : : : : | |

## ORDER

**AND NOW**, this 8th day of August 2007, upon consideration of Defendants' Motion for Summary Judgment (Docket No. 15) and Plaintiffs' Response thereto (Docket No. 17), it is hereby **ORDERED** that Defendants' motion is **GRANTED**.

**JUDGMENT** is entered in favor of Defendants CITY OF PHILADELPHIA, PHILADELPHIA POLICE DEPARTMENT AND OFFICER JOHN RAMIREZ, and against Plaintiffs QUEEN CARNEY, individually and as Administrator of Estate of Edward Pickens and MALIK SEAN PICKENS and JAMAR EDWARD PICKENS, by their legal guardian,

CHALETTE ROLAND, and CHALETTE ROLAND, individually and in her own right and EMMANUEL SIDNEY by his legal guardian, SARAH SIDNEY, and SARAH SIDNEY, individually and in her own right.

       This case is **CLOSED**.

BY THE COURT:


*s/ Ronald L. Buckwalter, S. J.*
RONALD L. BUCKWALTER, S.J.